ALAMO TRUST CO. v. PRUDENTIAL LIFE INS. CO. OF TEXAS. *
(No. 5537.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 19, 1916. Rehearing Denied March 8, 1916.)

1. BANKS AND BANKING &154—DEPOSITS—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action by an insurance company to recover an alleged balance of a deposit with a trust company claimed by plaintiff to represent the selling price of stock sold to the trust company, in which the trust company claimed that the credit was fictitious and that it was acting as a trustee in collecting notes given by subscribers to stock in the plaintiff company, and did not itself buy the stock, evidence *held* sufficient to support a jury finding that there was a bona fide sale of the stock for a consideration paid by a deposit certificate with an agreement that the debt evidenced by the deposit slip might be canceled by the delivery of the stock to makers of the notes and delivery of the amounts collected on the notes to plaintiff.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 502–512, 515, 516, 518–533; Dec. Dig. &154.]

2. TRIAL &260 — INSTRUCTIONS — REPUDIATION.

In an action by an insurance company against a trust company to recover the balance of a deposit which the insurance company claimed represented the price of stock sold the trust company, where the court defined the term "sale," and no objection was made to the definition, it was unnecessary to give another abstract definition of such term.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. &260.]

3. TRIAL &242—MISLEADING INSTRUCTIONS.

In an action by an insurance company against a trust company to recover the balance of an alleged deposit claimed by plaintiff to represent the price of stock sold the trust company, in which defendant claimed that it was acting as trustee in collecting stock subscriptions, and did not itself purchase the stock, the court charged that in order to constitute a sale the agreement to sell and to pay must be unconditional; but, in charging as to what must be found to warrant a finding for plaintiff, it merely charged that it must be found that plaintiff agreed to sell, and not that it unconditionally agreed to sell. *Held* that, if it was proper to

use the term "unconditional" at all in view of the fact that there was no issue as to any conditional sale, the jury could not have been misled by the failure to receive such term, as they must have understood that they were required to find that the agreement was absolute and unconditional.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 569–576; Dec. Dig. ⊛242.]

4. TRIAL ⊛256—INSTRUCTIONS — NECESSITY OF REQUESTS.

In such action, it would not have been proper for the court to charge, unless requested, that the transaction was not a sale if defendant was only to make payment out of collections on notes of subscribers to plaintiff's stock, as this theory was not pleaded, and such an instruction might have been considered an intimation that the testimony showed some kind of a sale, and not an agreement to hold the stock as trustee.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 628–641; Dec. Dig. ⊛256.]

5. APPEAL AND ERROR ⊛1041 — HARMLESS ERROR—AMENDMENT OF PLEADINGS.

Defendant was not injured by the granting of permission to plaintiff to file a trial amendment after the verdict had been returned, where, in rendering judgment, the court refused the prayer of such amendment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4106–4109; Dec. Dig. ⊛1041.]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action by the Prudential Life Insurance Company of Texas against the Alamo Trust Company. From a judgment in favor of plaintiff, defendant appeals. Affirmed.

Ryan, Matlock & Reed, of San Antonio, for appellant. J. A. King, of Albany, and McFarland & Lewright, of San Antonio, for appellee.

MOURSUND, J. On January 30, 1914, the Prudential Life Insurance Company of Texas sued the Alamo Trust Company, alleging it had deposited $12,000 with defendant on November 16, 1912, which defendant refused to pay except as follows: December 12, 1912, $800; December 13, 1913, $100; July 18, 1913, $1,800; and September 8, 1913, $100. Recovery was sought of the balance, viz., $9,200, with interest from December 1, 1913. Plaintiff also alleged that on or about August 23, 1912, it deposited with defendant for collection certain promissory notes, described in an Exhibit A, attached to the petition, of the aggregate face value of $17,610, of which defendant accounted for only those enumerated in an Exhibit B, amounting to $4,040; that some of said notes, amounting to probably $7,500, are good, but defendant refused to account for or return the notes.

The defendant answered by denial of a deposit in cash of $12,000, denial of any indebtedness to plaintiff, denial that plaintiff deposited with it for collection, on the terms alleged in the petition, the notes described in Exhibit A, and denial of all other material allegations. And by way of verified special answer, defendant alleged that it organized

and opened for business June 18, 1912, under the banking laws of Texas, with (among others) W. A. King and T. W. Robertson as directors, they being also directors of plaintiff corporation, and Robertson has continued to be a director in both corporations, but King ceased being a director of defendant company on February 26, 1913, though he has always been a director of plaintiff company, and for about a year has been its president; that when defendant opened for business King and Robertson, who was then the president of plaintiff company, were engaged in efforts to increase its capital stock and sought the assistance of defendant, and represented to defendant that plaintiff owned many promissory notes, given for subscriptions to its capital stock on the basis of two for one, and, as its directors wanted to increase the capital stock to the amount of $6,000, it would unconditionally indorse to defendant good subscription notes greatly in excess of $12,250, if the defendant would enter upon its books a credit of $12,250, and undertake the collection of said notes as if it was the owner thereof, the principal of said notes as fast as collected to be paid to plaintiff and deducted from the credit of $12,250; that defendant was to have for its services all interest and attorneys' fees it might receive in the collection of said notes; that no check or other requisition was to be drawn against the credit so entered on defendant's books by plaintiff, and none has been presented by or in behalf of plaintiff; that by virtue of said agreement, which was verbal, plaintiff delivered to defendant in trust for the makers of said notes the shares of stock to which they would be entitled upon payment of their notes. It was further alleged that the first certificate delivered to defendant was for 60 shares of plaintiff's capital stock, and, as the makers of said notes paid them, the certificate delivered to defendant was returned by it to plaintiff and canceled, and, in lieu thereof, plaintiff would deliver to defendant certificates for the makers so paying their notes, together with a certificate for the shares then remaining unpaid which defendant held in trust for the makers of the unpaid notes, and as further payments of notes were made like steps would be taken in the return, cancellation, and reissue of certificates of stock in plaintiff company; that the total of the notes exceeded the amount of credit of $12,250, and the excess when collected was to be used by plaintiff, or by defendant in plaintiff's behalf in purchasing in the open market, the requisite stock for such of the makers of notes paying the same, as had not received the stock to which they became entitled; that such agreement was based upon the representations made by plaintiff's officers to defendant that plaintiff was launched upon a successful career (that all notes would be promptly paid), and

it was part of said agreement that, unless defendant collected in principal the sum of $12,500, plaintiff should have no claim against defendant for the part remaining uncollected. Defendant alleged further that of said 60 shares it still had uncollected in whole or in part the notes of six persons, whose names are mentioned, together with the number of shares held in trust for each, the aggregate number being 22; that it is ready to return the notes uncollected if plaintiff will credit it therefor against said credit deposit of $12,500.

By way of cross-action, defendant alleged it loaned plaintiff, in July, 1913, $1,800 to pay interest on the debt due on its building, and in September, 1913, $100 to be repaid out of proceeds of notes collected by defendant, making $1,900, less a credit of $800 so collected, leaving a balance of $1,100, with interest, for which it has a lien upon all of said notes. Defendant offered to deliver all uncollected notes to plaintiff, provided it be given judgment for its reasonable expenses in endeavoring to collect the notes; for the balance due of the $1,800 and $100 advances, with interest; that the remainder of the credit item of $12,250 be canceled to the amount of the notes to be returned; and that plaintiff be required to protect defendant against certain suits to cancel notes, and any claims that may be made by the makers of notes.

Plaintiff's first supplemental petition contains demurrers to defendant's answer, and, practically, a denial thereof.

Defendant, by trial amendment, alleged that the agreement pleaded by it was made on or about November 16, 1912, and that it was authorized and ratified by both corporations.

The cause was submitted upon one special issue, as follows: Did the plaintiff make a sale on or about November 15 or 16, 1912, to the defendant of 60 shares of the capital stock of the Prudential Life Insurance Company of Texas? The jury answered, "Yes." Upon this verdict judgment was entered in favor of plaintiff, as follows: For $5,950 balance upon deposit account with interest from December 1, 1913, to date of judgment, and $1,865, being amount of various notes collected by defendant, making a total of $8,368.50; that defendant turn over to plaintiff all subscription notes, and plaintiff should hold defendant harmless against any recovery in suits pending to cancel notes; and that defendant be allowed a credit of $250 incurred in defense of suits.

[1] On November 16, 1912, Albers issued and sent to Tighe, as secretary and treasurer of plaintiff company, a certificate of deposit reciting that plaintiff had deposited with defendant $12,000. The certificate was accompanied by a letter, written by Albers, as active vice president of defendant, in which he said:

"I take pleasure in herewith inclosing duplicate deposit slip for $12,000.00. Please have the stock certificate issued the first thing Monday morning and send over. I am expecting the examiner here almost any day and want to get things in shape."

The stock certificate for 60 shares was issued by Tighe in the name of Dr. Robertson, the then president of plaintiff corporation, who was also a director and vice president of defendant company. This was done by direction of Albers or Robertson. Robertson indorsed the certificate, and it was delivered to Albers, who remained in control thereof. On November 16, 1912, plaintiff company filed an amendment to its charter, and in connection therewith Robertson and Tighe certified that the 60 shares were owned by Robertson and were paid for in cash. Robertson admitted that he knew plaintiff could not take anything except cash, under the law, in payment for its stock.

At the end of the year, plaintiff, acting through Dr. Robertson and Tighe, made a sworn report to the insurance commissioner which showed that plaintiff had on deposit with defendant $9,650. The deposit had to be reported to such commissioner as the equivalent of cash. The books of defendant company showed that on or about November 15 or 16, 1912, it purchased 60 shares of stock of plaintiff and paid therefor by a deposit to credit of plaintiff in the sum of $12,000, and that thereafter the stock was carried on the books of defendant as owned by it. Defendant, through its officers, reported about ten times to the bank commissioner that defendant was the owner of the stock. Defendant also issued to plaintiff deposit certificates for $540 on September 20, 1912, and $250 on November 19, 1912, making total deposits $12,790, and charged against plaintiff $1,800 paid plaintiff by draft and $100 expended by Albers in making a trip for plaintiff, and another $100, also other amounts, which will hereinafter be explained, so that the books of both corporations showed a balance due plaintiff of $5,950.

On August 23, 1912, plaintiff delivered to defendant for collection various notes given by subscribers for stock of plaintiff, aggregating about $15,000. Albers contended that these notes were delivered back to Robertson in November, and then returned to him by Robertson and Tighe with a statement showing which of them were considered good and which doubtful. Robertson corroborates this, but Tighe testified he knew nothing of the matter, except that he made certain lists for Robertson, who told him he was trying to sell some stock to Albers. As these notes were collected by defendant, and the proceeds paid to plaintiff, defendant had Tighe issue to such makers the shares of stock they became entitled to, taking same out of the 60-share certificate above referred to. Defendant parted in this manner with some of its 60 shares of stock, and charges plaintiff on its books with $200 for

each share it gave up. It also appears that 4 shares were sold by defendant to Poth, who was not one of the makers of notes, and defendant paid plaintiff $800 when such sale was made. Albers for some months had Tighe to issue certificate for remainder of 60-share certificate in the name of Robertson, but finally had it issued to himself for 33 shares, and then had one issued to defendant for 32 shares and to himself for 1 share; he having been elected a director of plaintiff company.

It appears that during the summer of 1912 defendant company had dealt to a considerable extent in stock in plaintiff company, at a good profit, and that a proposition to buy 213 shares in plaintiff company had been under consideration by the directors of defendant company, but that this was abandoned. The minutes fail to show anything about the trade finally made. Dr. Robertson testified the agreement was that Albers would give plaintiff a deposit for $12,000, take over the notes, and they estimated that about 60 shares of stock would be paid for out of the notes; that plaintiff was to have the deposit as a cash deposit and amend its charter, and as defendant collected the notes it was to turn the cash over to Tighe, and the amount of deposit would be reduced proportionally; that Albers was to issue stock out of the certificate for 60 shares to the people who paid their notes; that the deposit was not to be checked on; that the certificate was put in Robertson's name as trustee; he indorsed it to Albers, and so indorsed and delivered each succeeding certificate issued to him for the remainder of the 60 shares; that the interest on the notes was figured to November 15, 1912, and the agreement was that all interest accruing subsequent to that date should go to defendant, also attorneys' fees on notes sued on, and defendant should have additional compensation if Robertson and Albers thought defendant entitled thereto. He also said:

"I think I have read the answer of the defendant in this case. It is not true that said credit of $12,000 on the books of the Alamo Trust Company was intended or understood by plaintiff to be a credit in name only; we were to have that deposit to be used as a credit in that bank in order to get the capital raised and go and collect these notes and issue the stock, so we could issue this stock to these people and not be bothered about raising the capital. * * * At the time I made this agreement, I testified to, with Mr. Albers, I intended it to be a credit for that property we sold them, the notes and stock to go together, and that this deposit should be cashed as these notes were collected. Q. You say you sold him the notes and stock in connection with the notes? You sold him $17,000 worth of notes and 60 shares of stock, also, for this paper credit of $12,000? A. Whatever that figures, it is. I don't think the notes figured $17,000. This 60 shares of stock was to be delivered to these people as they paid these notes off. I sold him the notes and stock for $12,000, and he was to issue that 60 shares of stock to people as they paid those notes. Supposing they never pay the notes, then Mr. Albers will have only the stock. The plaintiff would get the $12,000 in money deposited there just as fast as the notes were paid. * * * As he got the cash, he was to pay for these shares of stock that he sold at a profit to Mrs. Raynor and Poth. I heard Mr. Tighe's testimony that the four shares were sold to Poth out of that 60-share certificate. I also saw 3 shares sold to Mrs. Raynor out of that same one. * * * The Alamo Trust Company has never held my shares of stock in the Prudential Life Insurance Company for collateral for a loan to me, or anybody else, except this 60 shares of stock they had, they and I didn't consider that mine. It belonged to them. I turned it over to them. I had nothing to do with it, except it was in my name. The Alamo Trust Company paid for it in the way I explained a while ago. I don't think it was ever discussed that, if none of these notes had ever been paid and none of that 60 shares of stock had been sold by Mr. Albers or the trust company, there was any agreement as to what should be done. I think that had been reported to the insurance commissioner as a cash transaction, by me and the secretary."

He testified the notes were just indorsed Prudential Life Insurance Company by him.

Albers testified that it was agreed between Robertson and himself that defendant would act in the capacity of trustee for the compensation testified to by Robertson, the duty of the trustee being to collect for plaintiff and deliver stock to the makers of the notes out of the 60-share certificate, and also to furnish plaintiff with a fictitious credit of $12,-000. According to Albers' testimony, the only person cognizant of the terms of the contract were Albers, Robertson, and an attorney who was at the time counsel for both companies and who was not called as a witness.

The $1,800 paid on draft of plaintiff company was charged on defendant's books against the $12,000 deposit, and was not charged as a loan, nor was any interest sought to be collected thereon, or note asked for. Albers testified that it was a loan to be repaid out of proceeds of notes when collected.

Tighe testified: That he knew nothing of any arrangement for a fictitious credit. That Albers led him to believe that the deposit slip represented purchase money for 60 shares of stock. That Robertson told witness that Albers was to deliver a deposit slip representing so much cash for the sale of 60 shares of stock and gave him to understand there was an agreement for the money to stay with defendant for some time, but he never could get anything definite out of Robertson with reference to time. That Albers told him Robertson had agreed that the money was to lie there for a certain length of time. He asked Albers how long a time, and Albers said:

"I don't know how long, but you need not worry about your annual statement. By the time you make draft, everything will be in the clear; you won't have to worry about making any explanation."

That when Albers agreed to pay draft for $1,800 he said nothing about keeping back such amount out of collections. He testified

further that after the deal had been made he was told that when the defendant collected notes it was to be permitted to issue some stock to the makers out of the 60-share certificate. He also testified that an increase of capital stock could not be procured until the stock was paid for, and then by filing an amendment to the charter, so it was customary for the officers of plaintiff company to borrow stock from stockholders and issue same to those who paid for stock with the expectation of immediately getting it, and when the capital stock was increased these loans would be made good.

Dr. Robertson was succeeded by Dr. King as president of plaintiff company, and afterwards disposed of all of his stock except one share and ceased to be a director thereof. Dr. King testified that Albers came to him after he was elected president, and mentioned the deposit, saying that King knew Robertson had given him a reasonable length of time to sell the stock without withdrawing the money, and he did not want King to withdraw the money immediately; that King agreed to give Albers a reasonable time, and to notify him when he wanted to withdraw it; that later he told Albers they would have to call on him for $1,800 to pay interest to Pittsburgh Life & Trust Company; that Albers said it would be all right, there would be no trouble about it; that afterwards he told Albers they would have to withdraw the balance, as the insurance department would criticize them for borrowing from other banks when they had this balance with defendant; that the last time he talked with Albers the latter threatened to sue plaintiff on the notes; that Albers did not say defendant owned the notes, but said the notes were indorsed by plaintiff and therefore it was liable; that after his first conversation he spoke to Albers about the manner in which the notes were being handled, and Albers said:

"We are simply doing what you have already been doing. We are buying up stock for the Alamo Trust Company to give these people to facilitate matters and avoid any friction; then, when we have collected all we can and we have our final settlement, we can adjust this matter, and the Prudential can pay us back the stock we have advanced."

Dr. King also testified that he knew Robertson had promised Albers a reasonable time in which to sell the stock and to keep the money on deposit with defendant; that this was brought out at a directors' meeting of the Alamo Trust Company, when they voted to purchase the 60 shares of stock; that he (King) was a director of the Alamo Trust Company at the time; that he asked Albers at the meeting if any time had been agreed on, and Albers did not say what time had been fixed; that Robertson said to him:

"I made a trade with Mr. Albers to buy 60 shares of stock provided it goes through the directors of the Alamo Trust Company. You are one of the directors, and I want you to be sure and be there and help us to put it through."

J. B. Roberts testified that in November, 1912, Albers told him he had just bought a big lot of Prudential stock, which he wanted Roberts to sell, and he did sell 1 share. Not counting the 60 shares, defendant at that time only owned about 9 shares of stock in plaintiff company.

The foregoing statement shows the nature of the controversy and the contentions of the principal actors in the events leading up to the suit, and the testimony most favorable to plaintiff has been set out without mentioning the denials thereof. We conclude that the finding of the jury is supported by the evidence, and that the court did not err in refusing to instruct a verdict for defendant. The jury was warranted in finding that a bona fide sale of the 60 shares of stock was made by plaintiff to defendant, for a consideration of $12,000, which was paid by a deposit certificate, which was understood by the parties to be the equivalent of cash paid and deposited, but at the time it was agreed that the money would not be checked out until defendant should have had a reasonable time in which to sell the stock.

No questions relating to the terms of the sale were submitted. In fact, it was expressly agreed that the court should decide all questions except the one submitted to the jury. The evidence supports a finding that at the time of the sale, or thereafter, it was agreed that defendant would have the privilege of canceling its debt evidenced by the deposit slip to the extent of $200 per share for each share of stock it delivered to the maker of a subscription note when such note was collected. It could also have been found from the evidence that the defendant loaned plaintiff the stock it turned over to makers of notes, in order to facilitate collections, as the parties would expect delivery of the stock upon payment of their notes. The consideration moving defendant to enter into the contract was the agreement that it should receive all interest accruing after November 15, 1912, on all notes collected, besides such extra compensation as might be allowed. In addition, it appears that it had theretofore sold stock for $250 per share, so it could reasonably expect to make a profit on part, at least, of the 60 shares. Its acceptance of the terms may also be accounted for by the fact that in interlocking directorates it is no uncommon thing for a corporation to undertake the aid of another, and in this instance defendant's active vice president was justified in believing that defendant ran no risk of loss by buying the stock. The court declined to consider the furnishing of the shares by defendant to the makers of the notes as a loan, for no recovery was awarded plaintiff as to such shares, nor was it required to deliver same to defendant, and neither side complains of the failure of the

court to enter such a judgment. All assignments questioning the sufficiency of the evidence to sustain the verdict and judgment are overruled.

[2-4] The defendant filed a number of exceptions to the charge of the court, and assigns error upon the overruling of some of these and upon the failure to give a special charge containing an abstract definition of the term "sale." The court defined the term "sale," and no objection is made to the definition, so it was unnecessary to give another abstract definition which would not have aided the jury in the least in passing upon the issue. In defining the term "sale," the court stated that in order to constitute a sale the agreement to sell and to buy must be "unconditional," but proceeded to state what the jury would have to find with reference to this case in order to find that plaintiff sold defendant the stock, and in that connection did not say "unconditionally agreed to sell," but merely "agreed to sell." We doubt very much whether the court was called upon in the first instance to use the word "unconditional" in its definition, for there was no issue as to whether the acceptance of the offer to sell was conditional. No contention is made that the agreement was not absolute and unconditional, but the issue was whether it was an agreement for the sale of stock or one appointing defendant trustee for certain purposes. But if it was proper to use the term "unconditional," we think the jury could not have been misled by the failure to repeat it; for they must have understood that the court required them to find the agreement to be absolute and not conditioned upon the doing of some act or the happening of some event. Appellant also complains because the court did not tell the jury that even if defendant paid, or promised to pay, plaintiff for the stock, if such payment was to be made only when subscribers' notes were collected and out of such collections, and not otherwise, then the transaction was not a sale within the meaning of such special issue. This complaint is evidently based on the theory that the sale might be found by the jury to be one upon condition that title to the stock should not pass until the notes were collected. No such theory was pleaded by defendant, and it would not have been proper for the court to charge on it without a request, as to do so might have been considered an intimation that the testimony showed some kind of a sale, and not an agreement to hold the stock as trustee. It is evident that, if defendant was entitled to have the issue submitted, it was its duty to prepare and request the submission of a special charge to the effect that if they found such to be the agreement, and found that the condition had not been complied with, then to find that no sale of the stock had taken place. Assignments Nos. 5,

6, 7, and 8, all of which relate to the manner in which the case was submitted, are overruled.

[5] By the ninth assignment complaint is made because the court permitted the filing of a trial amendment after the verdict had been returned. The bill of exceptions shows that the court in rendering judgment refused the prayer in such amendment. It therefore appears that defendant suffered no injury by the ruling of the court.

The judgment is affirmed.